ADAM L. BRAVERMAN
United States Attorney
MICHAEL A. DESHONG
Assistant U.S. Attorney
California Bar No. 301041
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
Tel: (619) 546-9290
Email: michael.deshong@usdoj.gov

Attorneys for the Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TREVON ANTONE LUCAS (1),<br>DONOVAN ADONTAS CARTER (2),<br>KEVIN VANDALE CHANDLER (3),<br>CENCLAIR MARIE FIELDS (4),<br><br>Defendants. | Case No. 18-cr-4224-CAB<br><br>**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR DISCOVERY, DISCLOSURE, PRESERVATION OF EVIDENCE; UNITED STATES' MOTIONS FOR RECIPROCAL DISCOVERY AND LEAVE TO FILE FURTHER MOTIONS**<br><br>Hearing Date:  November 9, 2018<br>Time:               10:30 a.m. |

The United States of America, by and through its counsel, United States Attorney, Adam L. Braverman, and Assistant United States Attorney, Michael A. Deshong, hereby files its Response in Opposition to Defendant's Motions for Discovery, Disclosure and Preservation of Evidence, and United States' Motions for Reciprocal Discovery and Leave to File Further Motions.

//

//

//

# I

# STATEMENT OF THE CASE

On September 28, 2018, the United States filed an Indictment charging (1) Trevon Antone Lucas ("LUCAS") with distribution of fentanyl resulting in death, and charging LUCAS, Donovan Adontas Carter ("CARTER"), Kevin Vandale Chandler ("CHANDLER"), and Cenclair Marie Fields ("FIELDS") (collectively, the "Defendants") with conspiracy to distribute and possess with the intent to distribute hydrocodone.  On October 11, 2018, CARTER's counsel filed a Motion for Discovery, Disclosure, and Preservation of Evidence.  ECF No. 28.  Counsel for LUCAS, FIELDS, and CHANDLER subsequently joined CARTER's motion.  The Government's response follows.

To date, the Government has produced voluminous discovery, including over 7,000 pages of photographs, reports, search warrant affidavits, and various subpoena responses.  Additionally, the Government has produced videos of all Defendants' post-arrest statements, surveillance footage from Shore Towers' apartment complex, surveillance footage from a Chevron gas station, and downloads of cell phones belonging to C.A.S., CARTER, and CHANDLER.

# II

# STATEMENT OF FACTS[1]

A.  **OVERDOSE DEATH OF C.A.S. ON JUNE 29, 2018**

   1.  **Background Information**

In June of 2018, C.A.S. was living with his mother in a condo in the Shore Towers complex, located at 2500 Torrey Pines Road in La Jolla, California.  C.A.S. had been living there since approximately June of 2017.  At some point between June and September 2017, C.A.S. began to communicate with LUCAS, primary regarding purchasing various types of prescription pharmaceuticals, including Xanax, Norco, and Roxicodone pills.  LUCAS communicated with C.A.S. through a phone number assigned to him through a third-party

---

[1] This is a brief recitation of the facts for the purposes of this motion.

application (i.e., not the primary phone number assigned to his phone). C.A.S. had LUCAS saved in his phone as "SD Norcs [slang for Norco pills]." LUCAS had C.A.S. saved in his phone as "SD SHORE TOWER" with two pill emojis in front of the text.

### 2. Communications Leading up to C.A.S.'s Death

LUCAS and C.A.S. began discussing their final drug transaction almost two weeks before C.A.S.'s death. On June 16, 2018, LUCAS contacted C.A.S. via text message to ask if he wanted to purchase any prescription drugs. C.A.S. responded that he would be interested if LUCAS had "blues."[2] LUCAS and C.A.S. then had an ongoing conversation regarding the quantity of pills, the price per pill, and a physical description of the pills. This conversation continued over two days (see excerpts below).

| Date | Time | Sender | Message |
|---|---|---|---|
| 6/16/18 | 3:22 p.m. | LUCAS | Hey do you need anything let me know |
| 6/17/18 | 8:42 p.m. | C.A.S. | Sup bro. Thanks for heads up. Unless you got blues im good bro |
| 6/18/18 | 12:08 p.m. | LUCAS | How many blues are you looking for |
| 6/18/18 | 3:21 p.m. | C.A.S. | 15-20 |
| 6/18/18 | 3:22 p.m. | LUCAS | They are 30 each |
| 6/18/18 | 7:14 p.m. | C.A.S. | Right on |
| 6/18/18 | 7:17 p.m. | LUCAS | Did you want them |
| 6/18/18 | 7:58 p.m. | C.A.S. | Yeah. Was wondering which blues they were? |
| 6/18/18 | 8:39 p.m. | LUCAS | Has M in a box 30 on the other side |
| 6/18/18 | 9:00 p.m. | C.A.S. | Cool bro |
| 6/18/18 | 9:02 p.m. | C.A.S. | I just didn't want any misunderstandings about the blues we had before.[3] I know it's a drive for you homie |
| 6/18/18 | 9:07 p.m. | LUCAS | No these are much better |

After this exchange, C.A.S. and LUCAS re-started their discussion on June 21 re-confirmed the quantities and types of drugs C.A.S. wanted to purchase.

---

[2] "30s," "blues," or "Roxies" are all slang terms for pills for 30 mg oxycodone pills sold under the brand name Roxicodone. The pills themselves are blue with a "30" stamped on one side, which is why they are often referred to as "blues" or "30s." Roxy, a shortened version of the pill's brand name, is also a surf clothing company. As a result, "board shorts" is also sometimes used as a coded reference to these pills.

[3] After two prior transactions in September and October 2017, C.A.S. had complained that some of the "blues" were severely chipped.

| Date | Time | Sender | Message |
|---|---|---|---|
| 6/21/18 | 8:45 p.m. | C.A.S. | Come out for 5 [asking SD NORCS if he will drive to San Diego for a $500 transaction] |
| | 9:01 p.m. | LUCAS | Yes |
| | 9:09 p.m. | C.A.S. | Ok for real |
| | 9:32 p.m. | LUCAS | All 30s or xanx too |
| | 9:35 p.m. | C.A.S. | 15 30s 6-7xanx |

They attempted to set up a meeting for the following day, June 22, 2018, but were never able to actually meet. Either C.A.S. would fail to answer his phone when LUCAS was in San Diego or was unable to drive meet LUCAS because his car was in the shop. They ultimately decided they would meet the following week.

### 3. Transaction on June 29, 2018 Between LUCAS and C.A.S.

On June 29, 2018, LUCAS followed up with C.A.S. and he told LUCAS he could spend $200-250 and they agreed to meet around 10:00 p.m. that night.

| Date | Time | Sender | Message |
|---|---|---|---|
| 6/29/18 | 12:17 p.m. | LUCAS | I'll be out there a little later today are you interested |
| | 3:54 p.m. | C.A.S. | Right on. If your around I got bout 2 maybe 250$ I could drop |
| | 3:56 p.m. | LUCAS | Sounds good to me |
| | 3:59 p.m. | C.A.S. | What time you thinking |
| | 6:55 p.m. | LUCAS | Around 10 boss |

A few hours later, LUCAS messaged C.A.S. to get his address and again confirm the number of pills that C.A.S. would be purchasing.

| Date | Time | Sender | Message |
|---|---|---|---|
| 6/29/18 | 9:32 p.m. | LUCAS | Send me your address boss |
| | 9:33 p.m. | C.A.S. | 2500 Torrey pines Rd 92037 |
| | [*additional messages coordinating time omitted*] | | |
| | 11:08 p.m. | LUCAS | I can throw in an extra 4 for 100 if you want |
| | 11:12 p.m. | C.A.S. | I only got 240 so 9 for 240? |
| | 11:13 p.m. | LUCAS | Yeah |
| | 11:14 p.m. | C.A.S. | K, how long now cause close to snoozing bro? |
| | 11:19 p.m. | C.A.S. | ?? |
| | 11:21 p.m. | LUCAS | I'm here |
| | 11:23 p.m. | C.A.S. | K. Coming down bro |

At 11:24 p.m., security camera footage from C.A.S.'s building shows him getting off the elevator in the lobby, and walking towards the front entrance. At the same time, the parking lot camera shows a dark sedan pull into the lot and park. Almost immediately after the dark sedan parks, C.A.S. can be seen walking across the parking lot towards the dark sedan and an individual walks from the direction of the sedan to greet him. The entire transaction only takes approximately sixty seconds before C.A.S. can be seen walking back towards the building.

Less than fifteen minutes after this exchange, at around 11:42 p.m., C.A.S. messaged LUCAS: "Cool those legit, thanks." This message was the last time anyone heard from C.A.S.

### 4. Discovery of C.A.S.'s Body

On Saturday, June 30, at some point before 8:00 a.m., C.A.S.'s mother woke up and walked to the kitchen. On the way, she noticed the door to C.A.S.'s room was slightly ajar and the light was on. This caused her concern because he should have already left for his job at Greens Please, a smoothie place in Poway. She walked into the room and found C.A.S. sitting in his desk chair slumped over to one side so severely that his head was almost touching the ground. His face was dark and purple—as if it were bruised. He was cold. There was a line of white powder on his desk with a curled twenty-dollar bill next to it. C.A.S. was clutching his driver's license in his hand.

At approximately 8:08 a.m., C.A.S.'s mother called 911. The dispatcher told her to move C.A.S. to the floor and begin CPR. She tried to move him to the floor, but he was so stiff he became tangled in the chair and fell to the ground. She did not even attempt CPR because it was apparent he was dead.

### 5. Medical Examiner's Report

Dr. Abubakr A. Marzouk, M.D., Deputy Medical Examiner, conducted an autopsy on C.A.S. on July 1, 2018. Dr. Marzouk concluded that C.A.S. died of fentanyl intoxication. The toxicology screen was positive for fentanyl, 4-Aminoantipyrine, and 4-Methylaminoantipyrine. 4-Methylaminoantipyrine is a metabolite of dipyrone, one of the

substances found in the line of powder on C.A.S.'s desk. Dr. Marzouk did not find any evidence of trauma or other significant natural disease.

**B.     DEFENDANTS' ARREST ON JULY 3, 2018**

    **1.     Agents Order More Drugs from C.A.S.'s Cell Phone**

On July 2, 2018, agents obtained a state search warrant authorizing them to search and utilize C.A.S.'s cell phone.  Pursuant to this warrant, agents used C.A.S.'s cell phone to contact LUCAS. They asked LUCAS if he was "around here" and said they would have "450 to drop" the following day.

On July 3, 2018, at approximately 9:54 a.m., agents messaged LUCAS to say they were ready. He responded that he had "7 30s right now" and asked if they wanted him "to give you xanx the rest or norcos ?" The agents responded they would "[t]ake the 7 rest in bars." After some additional back and forth regarding when they would meet, LUCAS messaged that he was "15 mins away" at approximately 6:53 p.m. At around 7:16 p.m., he followed up to say he was "[h]ere."  At no point during the conversation did agents provide LUCAS with C.A.S.'s address nor did he ever ask for it.

At around the same time, a black Kia Optima sedan pulled in to the Shore Towers parking lot. When the Kia Optima came to a stop in the Shore Towers parking lot, a marked San Diego Police Department vehicle, along with DEA agents from the Narcotics Task Force, approached the Kia Optima and removed the four occupants. These four occupants are the Targets: (1) LUCAS (front passenger seat), (2) FIELDS (driver), (3) CHANDLER (rear driver-side seat), and (4) CARTER (rear passenger-side seat). The Kia was brand new with dealer plates and a temporary registration under FIELDS's name.

Upon searching the Kia, agents discovered that drugs and money surrounded LUCAS's seat. First, there was a plastic bag containing seven 30 mg Roxicodone pills and approximately two dozen suspected Xanax pills in the glove box. Second, there was another plastic bag containing approximately three dozen suspected Xanax pills in an

Angry Orchard cider box on the front passenger seat floor. Third, after removing LUCAS from the Kia, agents found $1,247 on the ground just below the front passenger door.

Agents also found a bottle containing twenty-nine (29) generic Norco (hydrocodone) pills sitting in the middle floor of the back seat. These pills were in a prescription bottle that had the patient's name scratched off the bottle. Agents later contacted the pharmacy that dispensed these pills and learned that they were prescribed to CARTER's mother.

Finally, agents recovered five cell phones from the vehicle. Each occupant claimed ownership of one cell phone, but all denied ownership of a white iPhone that had been used to communicate with C.A.S. LUCAS specifically denied ownership of the white iPhone and denied that his fingerprint would unlock it. Both of these statements proved to be lies. Agents obtained a state search warrant authorizing them to place LUCAS's fingers on the iPhone's sensor. After several attempts, agents were able to successfully unlock the white iPhone with LUCAS's fingerprint. In addition, the iPhone's "device info" screen identified it was "Trevon's iPhone" and the Apple ID was under the name "Trevon Lucas."

### 2. Analysis of CHANDLER'S Cell Phone

CHANDLER had two numbers for LUCAS saved as contacts in his phone. First, he had 909-372-6405 saved as "Tre Tha Shoe God." Agents confirmed this was the number for LUCAS's white iPhone.[4] Second, he had 909-737-8441 saved as "Tre Other Phone." This was the number for LUCAS's black iPhone. CHANDLER also had seven other contacts that appeared to be based on the name Tre or Trevon (e.g., Tray, Tre D, Tre Day, Tre Tha Locc, etc.). None of these numbers have been connected to LUCAS.

CHANDLER's phone revealed numerous instances where he actively participated in LUCAS's drug dealing endeavors. CHANDLER appears to have referred customers to LUCAS, met customers on LUCAS's behalf when he was not available, and assisted LUCAS in finding sources for certain pills. For example, in August 2017, when LUCAS received

---

[4] This is *not* the number that LUCAS used to communicate with C.A.S. LUCAS communicated with C.A.S. through 909-734-1413. LUCAS used an application on the white iPhone, "Textfree," to communicate with C.A.S. without providing his actual phone number.

notification from Craigslist that his posting had been flagged and referred to DEA, LUCAS took a screenshot and sent it to CHANDLER. CHANDLER told LUCAS that if he forwarded him the email, he would put his phone on "private" mode and click on it to investigate. When LUCAS told him he had already deleted it, CHANDLER advised him to "delete it out yo trash too."

On the evening of June 29, 2018, someone saved as "Kory" in CHANDLER's phone sent a text message in a group chat with CHANDLER and LUCAS asking "[w]hat y'all doin." At around 11:42 p.m.—almost immediately after the sale to C.A.S.—LUCAS responded in the group chat indicating that he was "[o]n my way from sd."

### 3. Analysis of CARTER's Cell Phone

CARTER's phone also had communications with both of LUCAS's numbers, but neither one is saved in his contacts. The communications between CARTER and LUCAS also reflect CARTER providing various forms of assistance to LUCAS as he purchased and re-sold drugs, including acting as muscle. For example, on June 22, 2018, at approximately 10:52 a.m., LUCAS messaged CARTER a screenshot of a female's Instagram page that included a photo of two bottles of Promethazine cough syrup. LUCAS asked if CARTER knew the woman in the pictures and if the bottles of Promethazine looked real. He told CARTER she was asking for $600 per bottle and he thought it sounded too good to be true. Finally, he asked CARTER to "[g]o with me later bring a piece [firearm] to cause ion trust the butch never seen her." CARTER responded "[w]hat time."

Further, on June 29, the day LUCAS sold C.A.S. the pills that killed him, LUCAS told CARTER at around 2:13 p.m. that he was going to "[s]lide to hemet for 850 come back than go to sd for 1500."

CARTER also implicated FIELDS in selling prescription drugs. On June 29, 2018, CARTER told LUCAS he needed money and LUCAS offered him some Norcos for $3.00 per pill. LUCAS then told CARTER that "Suite [FIELDS] mom got em and I get em from her all the time but you can grab em it's at least 90." Then on July 3, 2018, before the group

left, CARTER messaged FIELDS directly at approximately 1:52 p.m. to tell her that he was "[f]inna go sell these norcos."

### III

### RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

The Government acknowledges and recognizes its continuing obligation to disclose exculpatory evidence and discovery as required by *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), Jencks Act and Rules 12 and 16 of the Federal Rules of Criminal Procedure, and will abide by their dictates.  To the extent Defendants' Motion to Compel Discovery seeks information beyond the scope of these obligations, the Government opposes such requests.

**A.     DEFENDANTS' STATEMENTS**

Pursuant to Rule 16(a)(1)(A) of the Federal Rules of Criminal Procedure, the Government has and will continue to make available for inspection, copying or photographing, any relevant written or recorded statements made by Defendants, or copies thereof, within the possession, custody, or control of the Government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the Government and that are relevant to the crime charged; that portion of any written record containing the substance of any relevant oral statement made by Defendants whether before or after arrest in response to interrogation by any person then known to Defendants to be a Government agent; and recorded testimony of Defendants before a grand jury which relates to the offense charged. The Government has produced audio/video recordings of all four Defendants' responses to routine booking questions, *Miranda* warnings, and, if applicable, their post-arrest statements.

**B.     ARREST REPORTS, NOTES, DISPATCH TAPES, AND AUDIO/VIDEO RECORDINGS**

Defendants request arrest reports, rough notes, and dispatch tapes.  Defendants have requested notes and rough notes relating to the investigation.  Defendants are not entitled

to rough notes taken during statements to arresting officers. *See Palermo v. United States*, 360 U.S. 343, 355 n.12 (1959); *United States v. Alvarez*, 86 F.3d 901, 904 n.2 (9th Cir. 1996). Nonetheless, the United States will take steps to preserve such rough notes. Similarly, they are not entitled to an order directing the Government to make and produce a transcript of the statements. *See United States v. Zavala*, 839 F.2d 523, 528 (9th Cir. 1988). The United States has produced reports of Defendants' arrests

## C. EXCULPATORY INFORMATION

The Government acknowledges and recognizes its continuing obligation to disclose exculpatory evidence and discovery as required by *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), Jencks Act and Rules 12 and 16 of the Federal Rules of Criminal Procedure, and will abide by their dictates. To the extent Defendants' Motion to Compel Discovery seeks information beyond the scope of these obligations, the Government opposes such requests.

## D. REQUEST FOR CRIMINAL RECORD, PRIOR BAD ACTS, AND NOTICE UNDER FRE 404(b)

Pursuant to Rule 16(a)(1)(D), Fed. R. Crim. P., the Government has furnished Defendants with a copy of any prior criminal record, namely, a rap sheet. The Government will disclose in advance of trial the general nature of other crimes, wrongs, or acts of Defendants that it intends to introduce at trial pursuant to Rule 404(b) of the Federal Rules of Evidence. The Government agrees to disclose this information one week prior to trial.

The Government objects to Defendants' request for notice of conduct that may be used as impeachment under Federal Rule of Evidence 608(b). This request is inappropriate to the extent that Rule 608(b) does not require notice regarding the use of such information and Defendants has not identified any prospective witnesses.

## E. OTHER DOCUMENTS AND PHYSICAL EVIDENCE

Pursuant to Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure, the Government has and will continue to permit Defendants to inspect and copy or photograph

books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, that are within the possession, custody or control of the Government, and that are material to the preparation of Defendants' defense or are intended for use by the Government as evidence during its case-in-chief at trial, or were obtained from or belong to Defendants.

### F.   WITNESS DISCOVERY

The Government is aware of its duty under *Giglio v. United States*, 405 U.S. 150 (1972), and will disclose the terms of all agreements (or any other inducements) with cooperating witnesses or Defendants, if any are entered into, at the time that the identities of these individuals is revealed. Specifically, in this regard, the Government will turn over plea agreements, cooperating individual agreements, and payments for information, services and/or expenses.

The Government will disclose any record of prior criminal convictions, if any, that could be used to impeach a Government witness prior to any such witness's testimony. However, the Government is under no obligation to turn over the criminal records of all witnesses. *United States v. Taylor*, 542 F.2d 1023, 1026 (8th Cir. 1976), cert. denied, 429 U.S. 1074 (1977). When disclosing such information, disclosure need only extend to witnesses that the Government intends to call in its case-in-chief. *Matylinsky v. Budge*, 577 F.3d 1083, 1094 (9th Cir. 2009) (citing *United States v. Gering*, 716 F.2d 615, 621 (9th Cir. 1983)); *United States v. Angelini*, 607 F.2d 1305, 1309 (9th Cir. 1979).

The Government will provide a description of the prior bad acts, if any exist, of the Government's witnesses pursuant to Federal Rule of Evidence 608(b) to the extent that the information within the Government's possession reasonably relates to the credibility of a witness.

Defendants has requested information regarding prospective witnesses and individuals the United States does not intend to call. The United States will comply with its obligation under with *Brady*, *Giglio*, and *Henthorn* and will provide any relevant

materials for witnesses it intends to call in its case-in-chief at a later date, if any are found. However, Defendants have no right to any of this information merely because an individual is a prospective witness and has absolutely no right to this information for individuals the United States does not intend to call for its case-in-chief.

Defendants "requests the name and last known address of each prospective government witness." The United States will provide a list of witness names in its trial memorandum. At this time, the United States only anticipates calling law enforcement witnesses. Their work addresses are publicly available.

## G.   EXPERT WITNESSES

Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, the Government will provide Defendants with a written summary of testimony of all experts that the Government intends to introduce under Rules 702, 703, and 705 of the Federal Rules of Evidence. The Government will provide such information a reasonable time in advance of trial.

## H.   RESIDUAL REQUEST

The Government acknowledges and recognizes its continuing obligation to disclose exculpatory evidence and discovery as required by *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), Jencks Act and Rules 12 and 16 of the Federal Rules of Criminal Procedure, and will abide by their dictates.

## I.   PRESERVATION OF EVIDENCE

Defendants request the preservation of evidence. The United States has already provided audio/video recordings of Defendants' arrest and the seized drugs have been sent to a lab for testing (and are therefore also being preserved). If there is any other specific physical evidence for which Defendants seek preservation, he should specifically articulate the item he would like preserved, so that the United States may act upon it.

//

//

## IV

## **MOTION FOR RECIPROCAL DISCOVERY**

The Court should also order Defendants to produce reciprocal discovery. Thus far, the United States has produced discovery in accordance with applicable rules and law, and the United States will continue to adhere to its discovery obligations. The discovery provided includes documents and objects which are discoverable under Federal Rule of Criminal Procedure (FRCP) 16(a)(1)(E). Consequently, the United States is entitled to discover from defendant any books, papers, documents, data, photographs, tangible objects, buildings, or places, or copies or portions of any of these items, that are in defendant's possession, custody, or control and which Defendants intend to use in Defendants' case-in-chief. *See* Fed. R. Crim. P. 16(b)(1)(A).

The United States further requests that it be permitted to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, which are in the possession or control of Defendants, which Defendants intend to introduce as evidence-in-chief at the trial, or which were prepared by a witness whom defendant intends to call as a witness. Because the United States will comply with defendant's requests for delivery of reports of examinations, the United States is entitled to the items listed above under Rule 16(b)(1). The United States further requests a written summary of the names, anticipated testimony, and bases for opinions of experts defendant intends to call at trial under Federal Rules of Evidence 702, 703, and 705.

The United States also requests that the Court make such order as it deems necessary under Rule 16(d)(1) and (2) to ensure that the United States receives the discovery to which it is entitled.

FRCP 26.2 requires the production of prior statements of all witnesses, except defendant. Rule 26.2 thus provides for the reciprocal production of Jencks statements. The time frame established by the Rule requires the statement to be provided after the witness

has testified, as in the Jencks Act. Therefore, the United States hereby requests that defendant be ordered to supply all prior statements of defense witnesses by a reasonable date before trial to be set by the Court. This order should include any form these statements are memorialized in, including, but not limited to, tape recordings, handwritten or typed notes or reports.

## V

## MOTION FOR LEAVE TO FILE FURTHER MOTIONS

Finally, the United States respectfully requests the opportunity to file further motions should new information or legal issues arise.

## VI

## CONCLUSION

For the foregoing reasons, the United States requests the Court deny Defendant's Motions for Discovery, Disclosure, and Preservation of Evidencie, and grant the Government's Motions for Reciprocal Discovery and Leave to File Further Motions.

DATED: November 5, 2018                           Respectfully submitted,

ADAM L. BRAVERMAN
United States Attorney

*/s/ Michael A. Deshong*
MICHAEL A. DESHONG
Assistant United States Attorney

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TREVON ANTONE LUCAS (1),<br>DONOVAN ADONTAS CARTER (2),<br>KEVIN VANDALE CHANDLER (3),<br>CENCLAIR MARIE FIELDS (4),<br><br>Defendant. | Case No. 18-cr-4224-CAB<br><br>**CERTIFICATE OF SERVICE** |

IT IS HEREBY CERTIFIED THAT:

I, Michael A. Deshong, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of the attached document, on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Keith Rutman, Esq., Attorney for LUCAS (1)

Lupe Rodriguez, Esq., Attorney for CARTER (2)

Nathan Feneis, Esq., Attorney for CHANDLER (3)

Danielle Iredale, Esq., Attorney for FIELDS (4)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 5, 2018

*/s/ Michael A. Deshong*
MICHAEL A. DESHONG
Assistant United States Attorney